UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

FILED

- - - - - - - - - - - - - - - -X
JOHN CIRASUOLO                    :    Docket No.____  2005 APR 14 P 2: 16
                                 :    (3:01 CR 85 (SRU))
            v.                   :    DECLARATION IN  U.S. DISTRICT COURT
                                 :    SUPPORT OF MOTION  BRIDGEPORT, CONN.
                                 :    UNDER 28 U.S.C. § 2255
UNITED STATES                    :    305CV0615 SRU
- - - - - - - - - - - - - - - -X

        JANE SIMKIN SMITH, an attorney admitted to practice law in

the Courts of New York State and in this Court, under penalty of

perjury hereby declares:

        1.    I am attorney for petitioner John Cirasuolo in this

matter, and submit this declaration in support of his motion to

vacate, set aside and correct his sentence under 28 U.S.C.§2255.

        2. I was appointed counsel by the Second Circuit Court of

Appeals pursuant to the Criminal Justice in connection with Mr.

Cirasuolo's appeal of his conviction to that Court.

        3. The central argument in that appeal was that Mr.

Cirasuolo was denied the effective assistance of counsel at

sentencing because his counsel inexplicably failed to seek a

horizontal departure under the Sentencing Guidelines on the

ground that Criminal History Category VI overstated the

seriousness of defendant's past conduct.

        4. The Government moved to dismiss the appeal, arguing that

the ineffective assistance of counsel claim should be resolved

on collateral review via a motion under 28 U.S.C. § 2255.

granted the government's motion and dismissed "without prejudice to appellant raising that contention in the district court on a motion pursuant to 28 U.S.C. § 2255." A Copy of the Court's Order is attached.

6. Mr. Cirasuolo renews the claim that his sentencing counsel was ineffective for failing to seek a downward departure under U.S.S.G. §4A1.3. In support of this claim, I submit to this court the brief that was filed in the Court of Appeals. I will not repeat in this declaration the facts and arguments which are set forth in detail in the brief. Rather, I incorporate them by reference.

7. In addition, Mr. Cirasuolo submits that he was deprived of the effective assistance of counsel because both trial and sentencing counsel failed to obtain Mr. Cirasuolo's mental health records.

8. With my assistance, Mr. Cirasuolo spent the last year (since the Court of Appeals dismissed his appeal) attempting to gather these records. To the extent that he has been successful, and to the extent that they are relevant, copies of these records are submitted to the court with this petition. They are filed in a sealed envelope so as to maintain Mr. Cirasuolo's privacy.

9. The mental health records were essential in connection with sentencing in June, 2003. Indeed, on July 30, 2003, trial

2

counsel (Roger Sigal of the Federal Defender's Office) had specifically asked for a continuance before the sentencing to obtain mental health records (along with a motion for a psychiatric evaluation in aid of sentencing). Inexplicably, though sentence was not imposed until June, 2003, it appears that sentencing counsel (Wayne Keeney) proceeded to sentencing without having obtained them.

10. The failure to obtain the records was prejudicial because they showed that Mr. Cirasuolo suffered from auditory hallucinations, paranoid schizophrenia, a "marked distortion in his perception of things," and was in need of psychotropic medications both years before, and during the months following, the evaluation by the court-appointed psychologist (in January, 2003). These findings refuted the psychologist's conclusion that "Mr. Cirasuolo's claim that auditory command hallucinations led up to the instant offense is of questionable validity," his assertion that "these psychotic symptoms [persecutory beliefs, anxiety, and depression] appear questionable", and the prosecutor's argument that Mr. Cirasuolo obstructed justice by fabricating and seeking to manipulate the test results.

11. In this connection, I draw the Court's particular attention to the following records which have been highlighted: the 1986 records from the Northside Counseling Center; the records of the psychiatrist Dr. Stephen J. Szabo and the Bay

3

Area Psychiatric Consultants regarding auditory hallucinations in 1997; the records from Bridges, A Community Support System, Inc. reporting, inter alia, severe anxiety, confusion and hearing voices in December, 2000; Connecticut Department of Correction record of auditory hallucinations in April, 2001; MCC psychiatrist Dr. Hillel Glover's references to "history of delusions", "command hallucinations" and "acute auditory hallucinations" in November, and December, 2002; and the report from the Wyatt Detention Center in May, 2003 that Mr. Cirasuolo was hearing voices and seeing things.

12. Examination of the mental health records before trial was also necessary in order for counsel to be able to properly advise Mr. Cirasuolo as to how to proceed. In this connection, I respectfully request that Mr. Cirasuolo be granted permission to submit *pro se* additional support for this part of his claim that he was deprived the effective assistance of counsel.

13. Sentencing counsel was also ineffective for failing to argue, based on Apprendi v. New Jersey, 530 U.S. 466 (2000), that enhancing the sentence based on a finding by the court that the defendant brandished a firearm - a fact not found by the jury - violated the Sixth Amendment.   By the time that Mr. Cirasuolo was sentenced, Apprendi-related claims were within the "prevailing professional norm," and, by failing to make such a claim, trial counsel's performance thus fell below "an objective

4

standard of reasonableness." <u>Strickland v. Washington</u>, 466 U.S. 668, 687-96 (1984). Since, as <u>United States v. Booker</u>, 125 S.Ct. 738 (2005), now makes plain, the Sixth Amendment claim is meritorious, one can easily conclude that, but for counsel's error, the result of the proceeding would have been different. <u>Strickland</u>, 466 U.S. at 694.

14. We recognize the Court of Appeals' recent holding in <u>Guzman v. United States</u>, __ F.3d __, Docket No. 03-2446-pr (April 8, 2005), that <u>Booker</u> does not apply retroactively to cases on collateral appeal. Nevertheless, to preserve Mr. Cirasuolo's rights in the event that the Supreme Court rules differently, Mr. Cirasuolo claims that the application of the Guidelines under the mandatory regime violated his Sixth Amendment rights and warrants the vacating of his sentence.

Wherefore, the relief requested should be granted. The sentence should be vacated, set aside and corrected.

Dated: Millbrook, New York
        April 13, 2005

                              _Jane Simkin Smith_
                              Jane Simkin Smith

# 03-1391

To be argued by
Jane Simkin Smith

UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT
Docket No. 03-1391

---

UNITED STATES OF AMERICA,

Appellee,

v.

JOHN CIRASUOLO

Defendant.

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

BRIEF AND APPENDIX FOR APPELLANT JOHN CIRASUOLO

---

JANE SIMKIN SMITH
Attorney for Appellant JOHN CIRASUOLO
P.O. Box 1277
Millbrook, New York 12545
(845) 724-3415

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ......................................... ii

JURISDICTIONAL STATEMENT ...................................... 1

STATEMENT OF THE ISSUES ....................................... 1

STATEMENT OF THE CASE ......................................... 1

SUMMARY OF ARGUMENT .......................................... 17

POINT ONE .................................................... 18

   Counsel Was Ineffective For Failing To Argue For A Downward
   Departure Under U.S.S.G. § 4A1.3................................................18

POINT TWO .................................................... 25

   The District Court Committed Plain Error By Not Making A
   Horizontal Departure On  Its Own.................................................25

CONCLUSION ................................................... 26

## TABLE OF AUTHORITIES

**Cases**

Strickland v. Washington, 466 U.S. 668 (1984) ...................................20, 24

United States v. Desena, 260 F.3d 150 (2d Cir. 2001) .........................25

United States v. Mishoe, 241 F.3d 214 (2d Cir. 2001) ..................18, 24

United States v. Rivers, 50 F.3d 1126 (2d Cir. 1995) .........................18

United v. Belk, 346 F.3d 305 (2d Cir. 2003) ...........................................25

**Statutes And Sentencing Guidelines**

18 U.S.C. § 3231 ...........................................................................................1

28 U.S.C. § 1291 ...........................................................................................1

U.S.S.G. §4A1.2(d) ....................................................................................22

U.S.S.G. § 4A1.2(e) ...................................................................................22

U.S.S.G. §4A1.3.................................................................................18, 19, 23, 24

## JURISDICTIONAL STATEMENT

John Cirasuolo appeals from a judgment of conviction, entered in the District of Connecticut (Underhill, J.) on June 18, 2003. Notice of Appeal was filed the same day. Jurisdiction below was conferred by 18 U.S.C. § 3231. Appellate jurisdiction is invoked pursuant to 28 U.S.C. § 1291.

## STATEMENT OF THE ISSUES

1. Whether defendant was denied the effective assistance of counsel where, at sentencing, counsel inexplicably failed to seek a horizontal departure on the ground that criminal history VI overstated the seriousness of defendant's past conduct.

2. Whether the district court committed plain error by not sua sponte considering and granting a horizontal departure.

## STATEMENT OF THE CASE

Mr. Cirasuolo was convicted after a jury trial of one count of bank robbery by force, violence or intimidation (in violation of 18 U.S.C. §2113(a)). He was sentenced to a prison term of 110 months and 3 years of supervised release, and ordered to pay $7450 in restitution and a $100 special assessment. Mr. Cirasuolo is currently incarcerated.

1

## STATEMENT OF FACTS

Introduction:  The  defendant  does  not  quarrel  that  the
evidence  presented  at  trial  sufficed  to  prove  he  committed  a
bank  robbery  at  the  federally  insured  People's  Bank  in  Orange,
Connecticut,  on  February  28,  2001.   Nor  does  he  contend  on
appeal  that  any  errors  committed  by  the  trial  court  warrant  a
new  trial.   Rather,  this  appeal  centers  on  the  sentencing.
Accordingly,  the  statement  of  the  offense  conduct  and  proof  at
trial  will  be  set  forth  only  summarily.

Trial:   On  February  28,  2001,  a  man  who  had  been  waiting  on
line  with  other  People's  Bank  customers,  stepped  up  to  a  teller
and  demanded  all  the  fifties  and  hundreds  from  her  drawer.   She
handed  him  approximately  $7500  after  he  displayed  what  appeared
to  be  a  gun,  the  handle  of  which  was  sticking  out  of  his  pants.
(T.5/8/02: 53-65)   The  man  put  the  money  in  a  bag,  and  left  the
bank.   A  customer  followed  him  outside  and  watched  him  get  into
a  car  and  leave. (T. 5/8/02: 64, 195-208)

The  proof  that  Mr.  Cirasuolo  was  the  robber  came  from
several  sources:   testimony  of  eyewitnesses  who  observed  the
robbery,  the  robber,  and  his  get-away  car  (T. 5/8/02: 86-89, 91,
207-8);   testimony  of  the  former  owner  of  the  get-away  car,  who
identified  the  car  captured  in  bank  surveillance  photographs  as
the  car  she  had  sold  to  the  defendant  in  November,  2000  (T.

2

5/10/02: 32-38); testimony of a friend of Mr. Cirasuolo that, on March 15, 2001, he had confessed to her his commission of the robbery (explaining that he did so because he was sick, out of work and in debt, and that he had used a fake gun), and, that, thereafter, Mr. Cirasuolo gave her the get-away car (T/ 5/10/02: 84-88); and evidence that, immediately prior to the robbery, Mr. Cirasuolo had insufficient funds in his bank account to cover the checks he was writing for cash, while soon after the robbery, he made significant cash expenditures for two cars. (T. 5/10/02: 242-256; T. 5/13/02: 23-5, 52-79)

The defense was, in essence, an attempt to cast doubt on the reliability of the eyewitness identifications and the credibility of the woman who reported the confession.  This was done primarily through cross-examination and evidence of prior inconsistent statements.  It also included the presentation of evidence that persons other than the defendant, but who matched the descriptions of the robber that had been provided by the eyewitnesses and/or the appearance of the person captured on the bank surveillance photographs, had been involved in similar conduct in the area both before and after defendant's arrest and incarceration. (T. 5/14/02: 31-7; 116-24; T.5/15/02: 8-17, 31-6)

3

Sentence: Prior to sentencing, the Court was made aware that Mr. Cirasuolo had an extensive history of mental illness. Among other things, the defendant's history included prior findings of incompetence in Florida Superior Court, hospitalizations at the Florida State Hospital, and psychiatric treatment in Connecticut, including at the Whalley Avenue and the Donald W. Wyatt Detention Center. (See, Motion For Continuance and For Psychiatric Evaluation In Aid of Sentencing, July 30, 2002).

Pursuant to 18 U.S.C.§ 3552(c), Judge Underhill ordered that, in aid of sentencing, Mr. Cirasuolo undergo a psychiatric evaluation. The examining psychiatrist was directed to not only examine the defendant, but also to review "any available psychiatric, psychological, medical, and other pertinent records" and to prepare a written report. The report was to include specific findings and conclusions as to "(1) Mr. Cirasuolo's history and present symptoms that might indicate the presence of a mental or emotional disease; (2) the examiner's opinion as to Mr. Cirasuolo's diagnosis, prognosis, and any recommended course of treatment; and (3) the examiner's opinion as to the existence of any mental or emotional disorders around the time of the offense, and the impact that any such disorder

4

may have had on defendant's thinking and judgment around the
time of the offense." (Order, August 1, 2002)

A psychological evaluation report was ultimately provided
to defendant's counsel in February 2003.    By that time, the
attorney who had represented Mr. Cirasuolo at trial (Roger Sigal
from the Federal Public Defender's Office) had been replaced and
new counsel had been appointed.   We argue in this appeal that
newly appointed counsel dropped the ball, that the report and
other material in the record relating to Mr. Cirasuolo's history
of mental illness supported a meritorious argument at sentencing
that was not made, and that, as a consequence, Mr. Cirasuolo's
sentence was higher than it should have been.

In particular, the material showed that, nearly two decades
earlier  -  between 1982-1984 --- Mr. Cirasuolo committed a
succession of offenses at a time when he was incontrovertibly
suffering from mental illness.   The inclusion of all of these
offenses in the Presentence Report's Criminal History calculus,
however, resulted in a Criminal History Category VI, the most
serious category in the Guidelines.   Even the Government had
made a lesser assessment: in a plea offer made right before
trial in March, 2002, it apparently did not count these aged
offenses since it maintained that a criminal history category of
III was appropriate. (A copy of that plea offer is included in

5

the Appendix.) Category VI thus overstated the seriousness of Mr. Cirasuolo's criminal history, and a horizontal departure was warranted.

The Psychologist's Report: Of the three areas of inquiry designated in the trial court's Order, the report was inconclusive only as to the third, that is, the examiner's opinion as to the existence and impact any mental disorder may have had on defendant's thinking and judgment around the time of the offense. There was no question that Mr. Cirasuolo had been and continued to be plagued by numerous mental disorders and that continuing psychiatric treatment was in order.

In his interview with the court appointed psychologist, Mr. Cirasuolo reported that auditory hallucinations drove him to rob the bank. However, the examiner suspected that Mr. Cirasuolo may have been untruthful. The "possibility of malingering or exaggerating mental illness" prevented the examiner "from answering the Court's [third] question with reasonable psychological certainty," (Report at 11), and, as a result, the examiner's "opinion" was indecisive:

> Regarding the issue of a significantly reduced mental capacity, Mr. Cirasuolo stated that he was responding to auditory command hallucinations that instructed him to rob the bank. To the extent that this is a credible report, criminal responsibility was mitigated by his psychiatric symptoms. (Psychologist's Report, at 12)

6

Other findings and opinions were stated with more certainty. Mr. Cirasuolo's report of a long history of psychiatric treatment and psychiatric medication (which, according to Mr. Cirasuolo began in his childhood) was corroborated by numerous records examined by the psychologist. These included those showing that he had been hospitalized in the Florida State Hospital on at least two occasions as a young adult (in 1983 and 1984) and treated for psychotic and depressive symptoms, and, more recently, that he had received psychiatric treatment and had been prescribed medication to treat seizures, depression, psychotic systems and anxiety throughout his stay at MCC-NY. (Psychologist's Report at 5, 6)

Importantly for purposes of this appeal, the hospitalizations in Florida were connected to Mr. Cirasuolo's arrests for offenses committed in the early 1980's (when Mr. Cirasuolo was in his late teens and early twenties). According to the psychologist's report, starting in 1984, Mr. Cirasuolo had been evaluated for competence on at least six occasions. He was first found incompetent to stand trial for burglary and grand theft charges in January, 1984, and committed to the hospital for evaluation and treatment. He was deemed competent to stand trial in May 1984. (Psychologist's Report, at 6)

7

According to the psychologist's report, another competency evaluation [following another arrest in February, 1985] was conducted in March, 1985, and, again, Mr. Cirasuolo was deemed incompetent to stand trial. As noted by the psychologist, a report written by Robert H. Coffer, M.D. at that time stated that "Mr. Cirasuolo presented as paranoid, tangential, and noncompliant with medication. Dr. Coffer's report therefore concluded that Mr. Cirasuolo was not competent to stand trial and that he met the criteria for involuntary hospitalization." (Psychologist's Report, at 6)

The psychologist reviewed four other competency evaluation reports prepared between 1984-86. While they concluded he was competent, they nevertheless described Mr. Cirasuolo during this period as "anxious, guarded and defensive, and as having some persecutory beliefs." (Psychologist's Report, at 6)

As for Mr. Cirasuolo's current condition, after performing a number of psychological tests in addition to interviewing the defendant and reviewing the prior medical records, it was the evaluator's opinion that Mr. Cirasuolo "does present with Mental Diseases under the law, that being Major Depressive Disorder, Recurrent, with Psychotic Features (Provisional)." He also diagnosed malingering; cocaine abuse; polysubstance abuse; posttraumatic stress disorder, provisional; paranoid personality

8

disorder; schizotypal personality disorder; and seizure disorder. (Psychologist's Report, at 12, 10)

The evaluator recommended that, if incarcerated, Mr. Cirasuolo should "continue with his appropriate medication and seen by psychological/psychiatric services on a regular basis." (Psychologist's Report, at 12)

Presentence Report: In a section entitled "Mental and Emotional Health," the Presentence Report ("PR") summarized the findings of the Psychologist's Report. (PR ¶¶ 56-7). It also added that defendant "has a reported history of hearing voices, suicidal ideation and at least one self reported suicide attempt, when he cut his wrists and forearms while in the Hillsborough County Jail in Florida. The defendant has been previously diagnosed with Bipolar Disorder, Attention Deficit Disorder and Post Traumatic Stress Disorder." (PR ¶ 55)

The Criminal History section (Part B) put flesh on the interconnection between these mental problems and the defendant's criminal history. Thus, the report shows that Mr. Cirasuolo left home (in Connecticut) in 1981 when he was 17 years old (PR ¶ 41) and began committing a series of burglaries. (PR ¶¶ 19-20)

Almost immediately, law enforcement authorities recognized the need for psychiatric treatment. Connecticut Department of

9

Correction documents showed that, in January, 1982, sentence was suspended and he was placed on probation for two burglaries that had been committed in the fall of 1981.  He was arrested just a few months later, on April 9, 1982, for use of a motor vehicle without permission.  On August 6, 1982 (just before he turned 18 on August 20), he was "readmitted" on the 1981 burglary and transferred to a psychiatric hospital where he remained for about a month, until September 3, 1982. (PR ¶¶ 20-21)

Just one week after his discharge, he was arrested (on September 11, 1982) in Hillsborough, Florida, for "burglary of a conveyance."   While that matter was pending, he was arrested again, on January 14, 1983, for the December 8, 1982 burglary of a residence and the theft of furniture and drapes.   The two matters were considered together, and, on April 7, 1983, Mr. Cirasuolo pled nolo contendere to both; adjudication was withheld and he was placed on probation. (PR ¶¶ 22-23)

Within months, he was rearrested (on August 5, 1983) for another burglary and theft from a residence (this time involving camera equipment), and once again (about a year after his discharge from the Connecticut psychiatric hospital), mental illness reared its head.  We can see this by comparing the dates set forth in the Presentence Report and the Psychologist's Report.

10

Thus, the Presentence Report indicates that Mr. Cirasuolo pled guilty to the August 5, 1983 offense more than a year after his arrest.   The reason for this delay can be gleaned from the Psychologist's Report which shows that he was found incompetent to stand trial in January, 1984, and committed to the Florida State Hospital for evaluation and treatment.   He was not found competent until May, 1984.   According to the Presentence Report, he pled guilty on August 21, 1984.

Again, no jail time was imposed.   This time, however, in addition to four years of probation, he was sentenced to one year of community control (which, according to PR ¶ 17 is a form of intensive probation). (PR ¶ 24)   The community control was, evidently, not effective, because, just three months later, on November 21, 1984, he attempted to commit yet another burglary.

Mr. Cirasuolo's mental condition was still an obvious concern.   After his arrest on February 9, 1985, another psychological evaluation was ordered. (PR ¶ 25)   And (as reflected in the Psychologist's Report, at 6), that evaluation, reported in March, 1995, once again concluded (as had the evaluation a year before in January, 1994) "that Mr. Cirasuolo was not competent to stand trial and met the criteria for involuntary hospitalization."

11

When he was finally deemed competent is not clear. However, he evidently underwent a number additional examinations. (Psychologist's Report, at 6; PR ¶ 26) Mr. Cirasuolo ultimately pled nolo contendere to the November 21, 1984 attempted burglary, but he did not do so until January 9, 1987, almost two years after his arrest. (PR ¶ 25) At the same time, he pled guilty to violating probation on the three burglaries committed in 1982 and 1983. (PR ¶¶ 22, 23, 24) He was sentenced for all four offenses (which had been committed between September 11, 1982 and November 24, 1984 – more than 15 years prior to the commission of the instant offense) on the same day, January 9, 1987. The sentences were concurrent. All together, he received a 5 year prison sentence, followed by 2 years of community control, followed by 8 years of probation. (PR ¶¶ 22-25) He was released from custody on December 29, 1988, having served a total of about two years. (PR ¶¶ 25)

Because a prison term exceeding one year and one month had ultimately been imposed on each of the 4 burglaries in 1987, that is, within 15 years of the commission of the bank robbery in 2001, 3 criminal history points were added for each pursuant to USSG §§4A1.1(a),(e)(1), for a total of 12 criminal history points. (PR ¶¶ 22-25)

12

Apart from one incident within a year of his release from custody (that was not counted in the Criminal History computation pursuant to U.S.S.G. § 4A1.2(e)(3); PR ¶ 27), Mr. Cirasuolo did not have any further arrests until 1996. Indeed, Mr. Cirasuolo explained to the probation officer that these were his "glory years" when he started taking prescribed psychotropic medications and his life improved. (PR ¶ 42-43) (During this period, he fathered a child. As will be discussed in more detail below, Mr. Cirasuolo's care for and special relationship with the child became the prime focus of counsel's attention at sentencing.)

Mr. Cirasuolo was arrested twice in a 4 month period in late 1996/early 1997: for leaving the scene of an accident with injury on September 20, 1996, and for purchasing cocaine on January 17, 1997. He pled guilty to both offenses the same day, on October 7, 1997, and was sentenced on both to 2 years community control followed by 3 years probation. (PR ¶¶ 28-29) Two years later, on September 22, 1999, a traffic stop led to his arrest for several offenses including burglary and theft (involving aluminum siding), and driving with a suspended license. He pled guilty to these offenses on February 21, 2000, and to violating his probation in connection with the 1996 and 1997 cases. (PR ¶¶ 30, 28-29).

As had happened with the 4 burglaries in 1980's, the three cases were joined for sentence. It does not appear that any actual jail or prison time was imposed. Rather, Mr. Cirasuolo received 78 month prison sentences "suspended to 24 months community control" for the probation violations, and 60 months "suspended to 24 months community control" for the burglary. (PR ¶¶ 28, 29, 30)[1] Accordingly, only one criminal history point was added for each of these three offenses pursuant to U.S.S.G. §4A1.1(c). (Id.) Because Mr. Cirasuolo was still on probation for these offenses when he committed the instant bank robbery, an additional 2 points were added under §4A1.1(d). (PR ¶ 31)

To recap, though Mr. Cirasuolo had served less than 2 years in prison for all of his past criminal conduct, he received a total of 17 criminal history points, placing him in Criminal History Category VI, the highest category on the criminal history scale. Not only were 12 of those points for the 4 burglaries committed more than 15 years earlier when he was a runaway youth clearly plagued by mental illness, but it was this very illness and the incompetence caused by it that delayed the

---

[1] The community control was converted to probation in June, 2000, allowing Mr. Cirasuolo to transfer his probation to Connecticut where he moved at that time to "provide family support for his daughter through reestablishing relations with ... a very close friend of the family who helped raise the defendant as a child, and was living in West Haven." (PR ¶¶ 28-30, 49)

14

sentencing to within 15 years and thus led to these stale
offenses to be counted at all.

The Defendant's Objections And Motions For A Downward
Departure: Defendant's counsel did not challenge the
criminal history calculation. (S. 10)  In a Memorandum In Aid of
Sentencing, he wrote that the Presentence Report "accurately
computes his Criminal History Category to be VI."  All he added
was that the "Defendant states in mitigation that the crimes
delineated were committed at times when he was not medicated."
(Memo, at 4)

Ignoring the horizontal continuum of the Guidelines,
counsel focused his attention on the offense conduct and Mr.
Cirasuolo's family circumstances.  He tried to persuade the
court that, given Mr. Cirasuolo's long history of mental
illness, it was "likely" that he was not malingering, but
actually suffering from a variety of mental disorders "at the
time of the offense which diminished his capacity to understand
the wrongfulness of his conduct."  (Memo, at 5; S. 4-7)  Counsel
also urged that Mr. Cirasuolo's relationship with his daughter
(over whom he had gained and maintained sole custody and with
whom he had a close, loving, and caring relationship
notwithstanding his lifelong struggle with mental illness)
warranted a downward departure. (Memo at 6; S. 20-21; 24-26)

15

Judge Underhill declined to depart downwards on either ground, though he gave lengthy consideration to an extraordinary family circumstance departure and denied it only "reluctantly." (S. 18-26; 27-28)   After correcting one portion of the Presentence Report calculation (in ¶ 10, the Report had added 5 points to the offense level for brandishing a firearm; the court reduced this to a 3 level increase for use of a fake gun (S. 9)), the judge determined that, with an offense level of 25 and a criminal history category VI, the guidelines range was 110-237 months (S. 11)[2]  He sentenced Mr. Cirasuolo to the bottom of the guideline range: 110 months in prison, followed by a period of three years supervised release. (S. 29)

Judge Underhill explained that his decision to sentence Mr. Cirasuolo to the bottom of the range was based on "the relationship you have with your daughter, but *also the fact that you have not spent any significant period of time in incarceration before now.*" (S. 29; emphasis added)

---

[2] The guideline ranges decreases dramatically as one moves horizontally across the table to lower categories: V, 100-125 months; IV, 84-105 months; III, 70-87 months; II, 63-78 months; I, 57-71 months.

## SUMMARY OF ARGUMENT

Criminal History Category VI – the highest category in the guidelines -- significantly overstated the seriousness of Mr. Cirasuolo's criminal history and the likelihood that he would commit future crimes.    A more appropriate measure would have been obtained had the four burglaries committed in the early 1980's -- over 15 years prior to the commission of the instant bank robbery when Mr. Cirasuolo was a runaway youth plagued by mental illness – been removed from the equation.    Yet, inexplicably, defendant's counsel failed to move for a downward departure on this basis and the court failed to do so on its own.    This deprived the defendant of the effective assistance of counsel and constituted plain error.

17

**POINT ONE**

## Counsel Was Ineffective For Failing To Argue For A Downward Departure Under U.S.S.G. § 4A1.3

U.S.S.G. §4A1.3 states, in relevant part, as follows:

> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.

This Court recognized, in United States v. Rivers, 50 F.3d 1126, 1130-31 (2d Cir. 1995), that "section 4A1.3 manifests the Commission's view that a sentencing judge should exercise discretion whenever the judge concludes that the consequences of the mathematical prior-history calculation, prescribed by sections 4A1.1 and 4A1.2 either underrepresent or overrepresent the seriousness of a defendant's prior record."

The Court elaborated, in United States v. Mishoe, 241 F.3d 214 (2d Cir. 2001). The determination of whether or not the applicable Criminal History Category ("CHC") significantly over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes requires an individualized consideration of the circumstances of a defendant's case. Id., at Among the factors the Court specifically identified as relevant to such an individualized

assessment were "the sentences previously imposed, and the amount of time previously served compared to the sentencing ranged called for by placement in" the otherwise applicable CHC. The Court went on to explain the reason why this factor was relevant. (Its specific reference to "career offender CHC" status (which was at issue in that case) applies equally to the category VI status at issue here):

> Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses. If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years. Conversely, if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect. We think the Commission's sensible recognition that a CHC may overrepresent a defendant's likelihood of recidivism permits a sentencing court, in appropriate cases, to include in its individualized consideration of a section 4A1.3 departure the relationship between the punishment prescribed by a career offender CHC and the degree of punishment imposed for prior offenses. In some circumstances, a large disparity in that relationship might indicate that the career offender sentence provides a deterrent effect so in excess of what is required in light of the prior sentences and especially the time served on those sentences as to constitute a mitigating circumstance present "to a degree" not adequately considered by the Commission. See 18 U.S.C. § 3553(b).

241 F.3d at 220.

19

Once a court determines that the applicable CHC overstated the seriousness of the defendant's criminal history or the likelihood of recidivism, the court should consider a downward departure which, in such a case, would be horizontal along the CHC axis of the Sentencing Table. Id., at 218, n.6.

Here, while a confluence of factors indicated that the applicable Category VI significantly overrepresented the seriousness of Mr. Cirasuolo's criminal history and the likelihood he would commit future crimes, counsel inexplicably failed to ask the judge to consider a downward departure on this ground. There was no strategic justification for his failure to do so. It represented a serious lapse in performance that fell below "an objective standard of reasonableness" under "prevailing professional norms," and there is a "reasonable probability that, but for counsel's professional error[], the result of the proceeding would have been different." Strickland v. Washington, 466 U.S. 668, 687-96 (1984).

Mr. Cirasuolo had served less than 2 years in prison for all of his past criminal conduct, and that time was served for a spate of burglaries committed more than 15 years earlier (in 1982-4) when he was a runaway youth clearly plagued by mental illness. His serious mental illness at the time is beyond question: during this period of his life, he had been

20

hospitalized for psychiatric care at least three times and over extensive periods -- once in Connecticut when he was still a juvenile, and twice in Florida when, as a young adult, he had been found incompetent to stand trial.

Nevertheless, because he was ultimately sentenced for these four offenses within 15 years of his commission of the bank robbery, he received 12 criminal history points for this early conduct. This alone would have placed him in Criminal History Category V. And though he committed additional offenses later in his life, these later offenses were not serious offenses. Indeed, neither the subsequent offenses themselves nor Mr. Cirasuolo's prior history of four burglaries were deemed serious enough by the Florida Court to warrant the imposition of any jail time at all. Yet, when combined with the points he received for the offenses he committed more than a decade later, the early burglaries caused his placement in Criminal History Category VI, the highest category on the criminal history scale.

Stated simply, Mr. Cirasuolo did not have the criminal background one would expect to find at this end of the scale. He wound up there because the six categories of criminal history in the Sentencing Table are keyed to the number and the length of a defendant's prior sentences, but not to the particular circumstances which (as in Mr. Cirasuolo's case) may reveal that

21

the numerical formula leads to the placement in a category that overstates the seriousness of the past conduct.

Here, neither the length of the prior sentences nor the number of prior offenses when examined in light of the particular circumstances reflected the seriousness of criminal history of a typical Category VI offender. First, the length of time that Mr. Cirasuolo had previously served in prison for a total of 7 offenses was less than two years. While not insignificant, this is relatively small. And it was served long ago, between January 1987 and December, 1988, when defendant was a very young man being treated for mental illness.

The lack of seriousness of the prior offenses is also indicated by the particular sentences that were initially handed down. With respect to 6 of the 7 prior offenses, the initial sentence was some form of probation.

Third, the 4 burglaries that contributed so heavily to the Category VI placement were right on the edge of not be counted at all. Under the Guidelines, not all prior offenses are counted. Among these are crimes committed when the defendant was a juvenile or outside the applicable time period of 15 years. See, U.S.S.G. §4A1.2(d),(e). The 4 early burglaries were committed more than 15 years prior to the instant offense; three of them were committed when the defendant was 18 years

22

old, and the fourth when he was 20. The only reason they fell within the applicable 15 year period is that for two years prior, defendant had been hospitalized after having been found incompetent to stand trial.

Examination of the circumstances of the prior offenses thus indicates that CHC VI overrepresents their seriousness. As for the likelihood of recidivism and the need for an adequate deterrence, yet another factor suggested that a lesser sentence than that called for in the CHC VI guideline range might be expected to have the requisite deterrence. And that was the especially important relationship Mr. Cirasuolo had with his young daughter. The daughter was 10 years old at the time Mr. Cirasuolo was sentenced. Incarceration for 110 months meant she would be an adult by the time he was released. If a lesson was to be learned by incarceration, that lesson could be learned in fewer than nine years, for he would surely be motivated to avoid reincarceration if released while she were still young.

There was no reason for Mr. Cirasuolo's counsel not to make these arguments at sentencing. Since horizontal, downward departures under U.S.S.G. §4A1.3 were recognized repeatedly in this Circuit, his failure to do so was unreasonable under an "objective standard of reasonableness" under "prevailing professional norms." There is also a "reasonable probability"

23

that, had the departure motion been made, "the result of the [sentencing] proceeding would have been different." <u>Strickland v. Washington</u>, 466 U.S. 668, 687-96 (1984).

First, it appears that Judge Underhill would have been receptive to these arguments. Indeed, when he imposed the sentence at the lowest end of the guideline range, he explained that did so because he was concerned with the deterrence aspect of the calculus. He specifically stated that he set the sentence at the low end based on "the relationship [Mr. Cirasuolo had with his] daughter, but also the fact that [he had] not spent any significant period of time in incarceration before now." This is the very kind of analysis encouraged by <u>Mishoe</u> when considering downward departures under section 4A1.3.

Furthermore, discounting the 4 early burglaries and moving downward 12 points to a CHC III was certainly a reasonable outcome. This is confirmed by the fact that, when it proffered a plea agreement on the eve of trial, the Government maintained that criminal history category III was the appropriate category for sentencing. The guideline range under CHC III for an offense at offense level 25 is 70-87 months. Given that Mr. Cirasuolo had been incarcerated only once before, and this was 14 years ago and for less than two years, and given that the pain inflicted by virtue of his removal from his daughter to

24

whom he was unquestionably devoted would serve as an additional deterrent, there is a reasonable probability that Judge Underhill also would have concluded that a sentence in this 70-87 range could reasonably be expected to have the requisite deterrent effect.

For all these reasons, counsel's failure to move for a downward departure deprived Mr. Cirasuolo of his constitutional right to the effective assistance of counsel. He should be resentenced so that this claim can be considered by the district court.

**POINT TWO**

**The District Court Committed Plain Error By Not Making A Horizontal Departure On Its Own**

Even though there was no motion for a downward departure in the criminal history category, the district court committed plain error by failing to depart downwardly in this case. Cf., United States v. Desena, 260 F.3d 150, 159 (2d Cir. 2001) (finding waiver in absence of plain error); United v. Belk, 346 F.3d 305, 314-5 (2d Cir. 2003) (Court finds no plain error in district court's failure to *sua sponte* consider and grant a vertical downward departure). For all the reasons that counsel should have made the downward departure motion that are discussed above in Point One, it should have been plain to the

25

court that, in this particular case, CHC VI overstated the seriousness of the defendant's criminal history, and that the length of sentence mandated under the CHC VI guideline range was excessive to provide adequate deterrence. A lesser sentence should have been imposed.

## CONCLUSION

For the above stated reasons, the judgment of conviction should be vacated, and the case remanded for re-sentencing.

January 6, 2004.

Jane Simkin Smith
Attorney for JOHN CIRASUOLO

26