UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

UNITED STATES OF AMERICA,

     -against-

JOHN CIRASUOLO,                                    3:01 CR-85 (SRU)

     Defendant

---

# SENTENCING MEMORANDUM
## OF JOHN CIRASUOLO

Jane Simkin Smith
Counsel for John Cirasuolo
P.O. Box 1277
Millbrook, New York 12545

UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

---

UNITED STATES OF AMERICA,

      -against-

JOHN CIRASUOLO,                          3:01 CR-85 (SRU)

      Defendant

---

## SENTENCING MEMORANDUM
## OF JOHN CIRASUOLO

This memorandum and attached exhibits are submitted on behalf of John Cirasuolo to assist the Court in connection with resentencing scheduled for June 29, 2006. Mr. Cirasuolo was convicted after a jury trial of one count of bank robbery in violation of 18 U.S.C. § 2113(a). On June 13, 2003, he was sentenced to a prison term of 110 months and 3 years of supervised release; he was also ordered to pay $7450 in restitution and a $100 special assessment. Mr. Cirasuolo has been incarcerated since March 29, 2001 (i.e., 63 months as of June 29).

Mr. Cirasuolo is being resentenced because of the ineffectiveness of his counsel at the initial sentencing. The ineffective assistance of counsel claim was made first on direct appeal, and then, after the appeal was dismissed (on April 30, 2004) on motion of the Government, in a §2255 petition filed in this Court on April 14, 2005.

Over five years have passed since the commission of this crime and Mr. Cirolsuolo's arrest and incarceration. In that time, several things have happened that call for a thorough reconsideration of the sentence. Not only has the Court recognized that former counsel failed to make compelling arguments that support the imposition of a lower sentence, but also the Supreme Court altered the sentencing landscape with its decisions in *Booker and Fanfan* making

the Guidelines advisory only. Equally important, there have been a series of disturbing and unfortunate changed circumstances in his daughter's life. At the same time, Mr. Cirasuolo has demonstrated exemplary rehabilitation while incarcerated over the past five years, and is determined and ready to reassume responsibility for the care of his daughter.

The overriding principle of any sentencing determination made now is found in 18 U.S.C. §3553(a): the sentence must be *sufficient but not greater than necessary* to comply with the four purposes of sentencing set forth in 18 U.S.C.§ 3553(a)(2). For the reasons discussed below, the period of incarceration previously imposed in this case is much greater than necessary, and a new sentence must be fashioned. As we show, a sentence of time served is sufficient.

In this submission we emphasize three points. First, Mr. Cirasuolo's thirteen-year-old daughter Jennie, to whom he remains devoted, has been suffering from numerous disruptions in her foster care placement, and yearns for some sense of permanency. Significantly, as set forth in its "Study In Support Of Permanency Plan And To Maintain Commitment" (dated 10/3/05), the Connecticut Department of Children and Families deems Jennie's ongoing relationship with Mr. Cirasuolo very important and continues to believe that reunification with her father upon his release from incarceration would be best for Jennie.

Second, though he continues to be plagued by mental illness, Mr. Cirasuolo has consistently worked to rehabilitate himself. He has taken advantage of, and successfully completed, all manner of available programs including educational and vocational courses, and drug abuse education; he has successfully completed programs in anger management, stress management, communication and relationship skills.

Third, in fulfilling its duty under 18 U.S.C. §3553(a)(4) to "consider" the Guidelines, the court must do two things: first, determine the applicable Guideline range, and then determine

what weight to give to this range. *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Here, calculation of the applicable range under Guidelines entails consideration of two departures: (1) since Category VI significantly overstates the seriousness of Mr. Cirasuolo's criminal history, a downward departure pursuant to U.S.S.G. §4A1.3 is appropriate; (2) a downward departure is also appropriate pursuant to U.S.S.G. §5K2.0 based on confluence of factors including the overstated criminal history category as well as extraordinary family circumstances, diminished capacity, perceived lesser harm, and history of physical, psychological and sexual abuse.

After *Booker/Fanfan*, the Guidelines are no longer mandatory, and the sentencing range under the Guidelines is only one factor the Court must consider in determining the sentence. If the Court concludes that the Guideline range previously calculated is still applicable, then the Guidelines should no longer be given determinative weight. Among other things, while this was hardly the most serious federal crime, data provided by the U.S. Sentencing Commission shows that the Guideline range previously calculated was *higher* than that in *85%* of all federal sentences imposed in 2003. Indeed, more than half of those sentenced for racketeering in 2003 received considerably less time. The 110 month sentence was not only *twice as high as* the average sentence imposed for all offenses, but also higher than the average sentence imposed for all robbery offenses. Now that the Court is free to, and must, consider the other factors set forth in §3553(a), a more reasonable sentence can be shaped. We turn now to those factors.

### 18 U.S.C. § 3553(a)(1): Nature and circumstances of the offense and the history and characteristics of the defendant

Mr. Cirasuolo robbed People's Bank in Orange, Connecticut, on February 28, 2001. As evidenced at trial, Mr. Cirasuolo was waiting on line with other People's Bank customers; when

it was his turn, he stepped up to a teller and demanded all the fifties and hundreds from her drawer. She handed him approximately $7500 after he displayed what appeared to be a gun, the handle of which was sticking out of his pants. (T.5/8/02: 53-65) He put the money in a bag, left the bank, and got into his car and drove away. (T. 5/8/02: 64, 195-208) As his friend testified at trial, Mr. Cirasuolo subsequently confessed to her that he had robbed a bank, and explained that he did so because he was sick, out of work and in debt, and that he had used a fake gun. (T. 5/10/02: 84-88)

Mr. Cirasuolo explained his motivations further in a submission to the Court in connection with the first sentencing in 2003. In short, Mr. Cirasuolo, who has had an extensive history of mental illness, was receiving psychiatric treatment at around the time of the robbery that included prescribed medication. However, he went off his medication at that time, and a series of incidents involving health professionals resulted in a complaint being lodged against him with the state's Department of Children and Families, a visit to his apartment by a Department worker and the determination that his apartment was too small for him and his daughter. Without the finances to move, desperate that he would lose his daughter, and suffering from depression, he made the disastrous and stupid decision to rob a bank.

Both Mr. Cirasuolo's history of mental illness and devotion to his daughter Jennie were noted in the PSR, and expanded upon at the first sentencing. (Mr. Cirasuolo's trial counsel, Roger Sigal, though relieved, took the unusual step of appearing as an advocate for Mr. Cirasualo at the first sentence. He tied the two matters together: "I think his relationship with his child is more than special; it's really phenomenal give the mental health issues that he's had and raising her as a single father....he is someone with extreme mental health problems who is motivated solely for his daughter's well being..." (S. 25-6))

4

The defendant's history of mental illness and commitment to his daughter are also well documented. Copies of voluminous medical records and copies of records relating to Jennie were submitted in connection with the §2255 petition (with the initial submission, with Mr. Cirasuolo's Declaration In Support of Petition filed in October, 2005, and with a letter from counsel dated January 23, 2006 urging resolution of the pending petition) and are incorporated herein by reference. A few additional documents (which were not available when these earlier submissions were made) are attached in an addendum to this memo. These records show a continuing struggle with mental illness and a continuing devotion to Jennie.

### The History Of Mental Illness

Among other things, Mr. Cirasuolo's mental health history before the first sentence included prior findings of incompetence in Florida Superior Court, hospitalizations at the Florida State Hospital, and psychiatric treatment in Connecticut, including at the Whalley Avenue and the Donald W. Wyatt Detention Center. In a section entitled "Mental and Emotional Health," the Presentence Report ("PR") summarized the findings of contained in a court-appointed psychologist's Report (PR ¶¶ 56-7), and added that defendant "has a reported history of hearing voices, suicidal ideation and at least one self reported suicide attempt, when he cut his wrists and forearms while in the Hillsborough County Jail in Florida. The defendant has been previously diagnosed with Bipolar Disorder, Attention Deficit Disorder and Post Traumatic Stress Disorder." (PR ¶ 55)

The medical records now before the Court show that Mr. Cirasuolo suffered from auditory hallucinations, paranoid schizophrenia, a "marked distortion in his perception of things," and was in need of psychotropic medications both years before, and during the months following, the commission of the offense. (See, in particular, the 1986 records from the

Northside Counseling Center; the records of the psychiatrist Dr. Stephen J. Szabo and the Bay Area Psychiatric Consultants regarding auditory hallucinations in 1997; the records from Bridges, A Community Support System, Inc. reporting, inter alia, severe anxiety, confusion and hearing voices in December, 2000; Connecticut Department of Correction record of auditory hallucinations in April, 2001; MCC psychiatrist Dr. Hillel Glover's references to "history of delusions", "command hallucinations" and "acute auditory hallucinations" in November, and December, 2002; and the report from the Wyatt Detention Center in May, 2003 that Mr. Cirasuolo was hearing voices and seeing things; see also, Motion For Continuance and For Psychiatric Evaluation In Aid of Sentencing, July 30, 2002.)

After he was sentenced by this Court (and despite the Court's recommendation that he be incarcerated in a facility near his daughter), Mr. Cirasuolo was removed to Butner Medical Federal Correctional Institution in Butner, North Carolina so that he could receive psychiatric treatment. Though he was fit enough to leave Butner, as recently as April 28, 2006, the Bureau of Prisons continued to recognize Mr. Cirasuolo's history of mental health problems and continuing need for treatment. (See, 04-28-2006 Treatment Plan, Otisville FCI, attached.)

Mr. Cirasuolo's Daughter Jennie

When Mr. Cirasuolo was initially sentenced in June 2003, this Court noted the extraordinary relationship between Mr. Cirasuolo and his (then) 10 year-old daughter, Jennie, and voiced concern about the effect that Mr. Cirasuolo's incarceration would have on her. The Court acknowledged the special bond between Mr. Cirasuolo and his daughter and expressed "respect" for how he had raised her. Though the Court "reluctantly" concluded that a downward departure for extraordinary family circumstances was not merited, it took into account the

relationship Mr. Cirasuolo had with his daughter when it sentenced Mr. Cirasulo to the bottom of the Guideline range. (S. 29)

The Government had argued against an extraordinary family circumstance downward departure under the then mandatory Sentencing Guidelines, arguing, among other things, that, because Jennie was in the custody of Mr. Cirasuolo's mother and stepfather (which the prosecutor described as "a loving household with blood relatives, not in some stranger's house"), and was "doing well", Mr. Cirasuolo's incarceration would not have an extraordinary impact on her. In rejecting the downward departure, the Court pointed out, "[Y]our daughter seems to be in a situation in which she's going to be fine. She's with relatives who clearly care for her and it's my belief that the good start you've gotten her off to will stand her in good stead." (S. 28)

Sadly, the Court's hopes for Jennie did not come true. Materials from the State of Connecticut Department of Children and Families (which were submitted to the Court in January, 2006) show that Jennie (who had been removed from the Connecticut foster home in which she had been placed shortly after Mr. Cirasuolo's arrest in 2001 when she was placed in the care of her grandmother in Illinois in May, 2003) remained in the care of her grandmother, Mrs. Kempster, only until June, 2004. This was because the Kempsters – who "felt that Jennie was oppositional and more than they could handle at their age" – asked for her to be removed from their home. When no other family members in Illinois came forward as a placement source for Jennie, she was returned to Connecticut and placed in another foster home, different from the one in which she had been placed initially.

The materials submitted to the Court last January reveal that Jennie is suffering as a result of the upheavals in her life, the rejection by her grandmother, and the numerous disruptions in her foster care placement, and that she yearns for some sense of permanency. Significantly, as

set forth in its "Study In Support Of Permanency Plan And To Maintain Commitment" (dated 10/3/05), the Connecticut Department of Children and Families deems Jennie's ongoing relationship with Mr. Cirasuolo very important and continues to believe that reunification with her father upon his release from incarceration would be the best thing for her.

Despite five years of incarceration, Mr. Cirasuolo remains committed to Jennie and is thoroughly engaged in her affairs. When the Department of Children and Families notified him last December that Jennie's placement had changed yet again, the Social Worker asked Mr. Cirasuolo to call so that she could provide him with an update on his daughter's status, and advised that Jennie was "recently disrupted from her placement and is now residing in a temporary placement, until a therapeutic home can be found. She has received the gifts, cards, and letters that you sent, but I am not sure why she hasn't written back." (See Notification dated December 5, 2005, attached.)

Mr. Cirasuolo is devoted to his daughter and is devastated by the suffering he has caused her by virtue of his incarceration. He has been detained for more than five years now, and is hopeful that the Court, apprised of Jennie's current situation, will now impose a shorter sentence and thereby accelerate the reunification with his daughter.

### 18 U.S.C. § 3553(a)(2): The need for the sentence to comply with the four purposes of sentencing

A sentence may not be greater than necessary to comply with the four purposes of sentencing set forth in section 3553(a)(2): retribution, deterrence, incapacitation, and rehabilitation. The 63 months that Mr. Cirasuolo has already served, and the suffering he has endured by virtue of his separation from his daughter and the pain he knows he has inflicted on her are sufficient punishment; his incapacitation for 63 months also provided the public with

protection from him while he received medical attention and vocational training. More than five years also provides significant and sufficient deterrence to Mr. Cirasuolo and to others.

The fourth purpose set forth in §3553(2) – the need for the sentence to provide for the defendant's rehabilitation – is also strong factor in favor of reducing the previously imposed 110 month sentence to time served. As demonstrated in the attached materials, Mr. Cirasuolo has successfully completed numerous educational, vocational and rehabilitation programs while incarcerated. His determination to participate and his achievement in these programs are clear signs of his rehabilitation. He has learned his lesson and is anxious to be reunited with his daughter so that he can begin to make up for the years of their separation. The pain of that separation is certain to keep Mr. Cirasualo from committing another offense.

### 18 U.S.C. §3553(a)(3): The kinds of sentences available

Since the Guidelines are now advisory, the only restrictions on the kind of sentence available are those imposed by statute. In this case, there is no restriction. In addition to a sentence of imprisonment, a split sentence, a probationary sentence, as well as a sentence of home confinement are available.

### 18 U.S.C. §3553(a)(4): The kind of sentence and sentencing range under the Guidelines

The prior determination of the offense level by the Court (S. 10) is not contested; that level, 25, was derived from a base offense level of 20 for robbery pursuant to § 2B3.1(a), + 2 pursuant to §2B3.1(b)(1) because the property of a financial institution was taken, + 3 pursuant to §2B3.1(b)(2)(E) because the Court could reasonably find that a dangerous weapon (or what appeared to be a dangerous weapon) was brandished.

9

This case is before the Court for resentencing because of counsel's failure to address the Criminal History axis of the Guidelines. Mr. Cirasuolo received a total of 17 criminal history points, placing him in Criminal History Category VI, the highest category on the criminal history scale. This mathematical calculation grossly misrepresents the seriousness of Mr. Cirasuolo's prior record. He was not a hardened criminal. He committed a bunch of minor offenses in his youth at a time when he was incontrovertibly suffering from mental illness.

### The Prior Offenses

The prior offenses are set forth in the PSR (¶¶ 17-30); the court-appointed psychologist's report prepared in connection with the sentencing proceeding in 2003 sheds additional light on some of the surrounding circumstances. Together, these documents show that 12 of the 17 criminal history points were from 4 burglaries committed *more than 15 years* before the commission of the bank robbery when Mr. Cirasuolo was a runaway youth clearly plagued by mental illness. Indeed, it was this very illness and the incompetence caused by it that delayed the sentencing to within 15 years and thus led to these stale offenses to be counted at all.

The psychologist's report thus points to records showing Mr. Cirasolo was hospitalized in the Florida State Hospital on at least two occasions as a young adult (in 1983 and 1984). Importantly, the hospitalizations in Florida were connected to Mr. Cirasuolo's arrests for offenses committed in the early 1980's (when Mr. Cirasuolo was in his late teens and early twenties). According to the psychologist's report, starting in 1984, Mr. Cirasuolo had been evaluated for competence on at least six occasions. He was first found incompetent to stand trial for burglary and grand theft charges in January, 1984, and committed to the hospital for evaluation and treatment. He was deemed competent to stand trial in May 1984. (Psychologist's Report, at 6)

According to the psychologist's report, another competency evaluation [following another arrest in February, 1985] was conducted in March 1985, and, again, Mr. Cirasuolo was deemed incompetent to stand trial. As noted by the psychologist, a report written by Robert H. Coffer, M.D. at that time stated that "Mr. Cirasuolo presented as paranoid, tangential, and noncompliant with medication. Dr. Coffer's report therefore concluded that Mr. Cirasuolo was not competent to stand trial and that he met the criteria for involuntary hospitalization." (Psychologist's Report, at 6)

(The psychologist reviewed four other competency evaluation reports prepared between 1984-86. While they concluded he was competent, they nevertheless described Mr. Cirasuolo during this period as "anxious, guarded and defensive, and as having some persecutory beliefs." (Psychologist's Report, at 6))

The Criminal History section (Part B) of the Presentence Report puts flesh on the interconnection between these mental problems and the defendant's criminal history. Thus, the report shows that Mr. Cirasuolo left home (in Connecticut) in 1981 when he was 17 years old (PR ¶ 41) and began committing a series of burglaries. (PR ¶¶ 19-20)

Almost immediately, law enforcement authorities recognized the need for psychiatric treatment. Connecticut Department of Correction documents showed that, in January, 1982, sentence was suspended and he was placed on probation for two burglaries that had been committed in the fall of 1981. He was arrested just a few months later, on April 9, 1982, for use of a motor vehicle without permission. On August 6, 1982 (just before he turned 18 on August 20), he was "readmitted" on the 1981 burglary and transferred to a psychiatric hospital where he remained for about a month, until September 3, 1982. (PR ¶¶ 20-21)

11

Just one week after his discharge, he was arrested (on September 11, 1982) in Hillsborough, Florida, for "burglary of a conveyance." While that matter was pending, he was arrested again, on January 14, 1983, for the December 8, 1982 burglary of a residence and the theft of furniture and drapes. The two matters were considered together, and, on April 7, 1983, Mr. Cirasuolo pled *nolo contendere* to both; adjudication was withheld and he was placed on probation. (PR ¶¶ 22-23)

Within months, he was rearrested (on August 5, 1983) for another burglary and theft from a residence (this time involving camera equipment), and once again (about a year after his discharge from the Connecticut psychiatric hospital), mental illness reared its head. We can see this by comparing the dates set forth in the Presentence Report and the Psychologist's Report.

Thus, the Presentence Report indicates that Mr. Cirasuolo pled guilty to the August 5, 1983 offense more than a year after his arrest. The reason for this delay can be gleaned from the Psychologist's Report which shows that he was found incompetent to stand trial in January, 1984, and committed to the Florida State Hospital for evaluation and treatment. He was not found competent until May, 1984. According to the Presentence Report, he pled guilty on August 21, 1984.

Again, no jail time was imposed. This time, however, in addition to four years of probation, he was sentenced to one year of community control (which, according to PR ¶ 17 is a form of intensive probation). (PR ¶ 24) The community control was, evidently, not effective, because, just three months later, on November 21, 1984, he attempted to commit yet another burglary.

Mr. Cirasuolo's mental condition was still an obvious concern. After his arrest on February 9, 1985, another psychological evaluation was ordered. (PR ¶ 25) And (as reflected in

the Psychologist's Report, at 6), that evaluation, reported in March, 1995, once again concluded (as had the evaluation a year before in January, 1994) "that Mr. Cirasuolo was not competent to stand trial and met the criteria for involuntary hospitalization."

When he was finally deemed competent is not clear. However, he evidently underwent a number additional examinations. (Psychologist's Report, at 6; PR ¶ 26) Mr. Cirasuolo ultimately pled nolo contendere to the November 21, 1984 attempted burglary, but he did not do so until January 9, 1987, almost two years after his arrest. (PR ¶ 25) At the same time, he pled guilty to violating probation on the three burglaries committed in 1982 and 1983. (PR ¶¶ 22, 23, 24) He was sentenced for all four offenses (which had been committed between September 11, 1982 and November 24, 1984 – more than 15 years prior to the commission of the instant offense) on the same day, January 9, 1987. The sentences were concurrent. All together, he received a 5 year prison sentence, followed by 2 years of community control, followed by 8 years of probation. (PR ¶¶ 22-25) He was released from custody on December 29, 1988, having served a total of about two years. (PR ¶¶ 25)

Because a prison term exceeding one year and one month had ultimately been imposed on each of the 4 burglaries in 1987, that is, within 15 years of the commission of the bank robbery in 2001, 3 criminal history points were added for each pursuant to USSG §§4A1.1(a),(e)(1), for a total of 12 criminal history points. (PR ¶¶ 22-25)

Apart from one incident within a year of his release from custody (that was not counted in the Criminal History computation pursuant to U.S.S.G. § 4A1.2(e)(3); PR ¶ 27), Mr. Cirasuolo did not have any further arrests until 1996. Indeed, Mr. Cirasuolo explained to the probation officer that these were his "glory years" when he started taking prescribed psychotropic

medications and his life improved. (PR ¶ 42-43)  (It was during this period that he fathered Jennie.)

Mr. Cirasuolo was arrested twice in a 4-month period in late 1996/early 1997: for leaving the scene of an accident with injury on September 20, 1996, and for purchasing cocaine on January 17, 1997.  He pled guilty to both offenses the same day, on October 7, 1997, and was sentenced on both to 2 years community control followed by 3 years probation. (PR ¶¶ 28-29)  Two years later, on September 22, 1999, a traffic stop led to his arrest for several offenses including burglary and theft (involving aluminum siding), and driving with a suspended license. He pled guilty to these offenses on February 21, 2000, and to violating his probation in connection with the 1996 and 1997 cases.  (PR ¶¶ 30, 28-29).

As had happened with the 4 burglaries in 1980's, the three cases were joined for sentence.  It does not appear that any actual jail or prison time was imposed.  Rather, Mr. Cirasuolo received 78-month prison sentences "suspended to 24 months community control" for the probation violations, and 60 months "suspended to 24 months community control" for the burglary. (PR ¶¶ 28, 29, 30)[1]  Accordingly, only one criminal history point was added for each of these three offenses pursuant to U.S.S.G. §4A1.1(c). (Id.)  Because Mr. Cirasuolo was still on probation for these offenses when he committed the instant bank robbery, an additional 2 points were added under §4A1.1(d).  (PR ¶ 31)

To recap, though Mr. Cirasuolo had served less than 2 years in prison for all of his past criminal conduct, he received a total of 17 criminal history points, placing him in Criminal History Category VI, the highest category on the criminal history scale.  Not only were 12 of

---

[1] The community control was converted to probation in June, 2000, allowing Mr. Cirasuolo to transfer his probation to Connecticut where he moved at that time to "provide family support for his daughter through reestablishing relations with ... a very close friend of the family who helped raise the defendant as a child, and was living in West Haven." (PR ¶¶ 28-30, 49)

those points for the 4 burglaries committed more than 15 years earlier when he was a runaway youth clearly plagued by mental illness, but it was this very illness and the incompetence caused by it that delayed the sentencing to within 15 years and thus led to these stale offenses to be counted at all.

Category VI Overstates The Seriousness Of The Criminal History

U.S.S.G. §4A1.3 states, in relevant part, as follows:

If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range.

The Second Circuit recognized, in United States v. Rivers, 50 F.3d 1126, 1130-31 (2d Cir. 1995), that "section 4A1.3 manifests the Commission's view that a sentencing judge should exercise discretion whenever the judge concludes that the consequences of the mathematical prior-history calculation, prescribed by sections 4A1.1 and 4A1.2 either underrepresent or overrepresent the seriousness of a defendant's prior record."

The Court elaborated, in United States v. Mishoe, 241 F.3d 214 (2d Cir. 2001). It held that the determination of whether or not the applicable Criminal History Category ("CHC") significantly over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit further crimes requires an individualized consideration of the circumstances of a defendant's case. Among the factors, the Court specifically identified as relevant to such an individualized assessment were "the sentences previously imposed, and the amount of time previously served compared to the sentencing ranged called for by placement in" the otherwise applicable CHC. The Court went on to explain the reason why this factor was relevant. (Its specific reference to "career offender CHC" status (which was at issue in that case) applies equally to the category VI status at issue here):

15

Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve. That reason requires an appropriate relationship between the sentence for the current offense and the sentences, particularly the times served, for the prior offenses. If, for example, a defendant twice served five or six years and thereafter committed another serious offense, a current sentence might not have an adequate deterrent effect unless it was substantial, perhaps fifteen or twenty years. Conversely, if a defendant served no time or only a few months for the prior offenses, a sentence of even three or five years for the current offense might be expected to have the requisite deterrent effect. We think the Commission's sensible recognition that a CHC may overrepresent a defendant's likelihood of recidivism permits a sentencing court, in appropriate cases, to include in its individualized consideration of a section 4A1.3 departure the relationship between the punishment prescribed by a career offender CHC and the degree of punishment imposed for prior offenses. In some circumstances, a large disparity in that relationship might indicate that the career offender sentence provides a deterrent effect so in excess of what is required in light of the prior sentences and especially the time served on those sentences as to constitute a mitigating circumstance present "to a degree" not adequately considered by the Commission. See 18 U.S.C. § 3553(b).

241 F.3d at 220.

Once a court determines that the applicable CHC overstates the seriousness of the defendant's criminal history or the likelihood of recidivism, the court should consider a downward departure which, in such a case, would be horizontal along the CHC axis of the Sentencing Table. Id., at 218, n.6.

Here, many factors indicate that the applicable Category VI significantly overrepresented the seriousness of Mr. Cirasuolo's criminal history and the likelihood he would commit future crimes unless given a particularly lengthy sentence. Mr. Cirasuolo had served less than 2 years in prison for all of his past criminal conduct, and that time was served for a spate of burglaries committed more than 15 years earlier (in 1982-4) when he was a runaway youth. His serious mental illness at the time is beyond question: during this period of his life, he had been hospitalized for psychiatric care at least three times and over extensive periods -- once in

16

Connecticut when he was still a juvenile, and twice in Florida when, as a young adult, he had been found incompetent to stand trial.

Nevertheless, because he was ultimately sentenced for these four offenses within 15 years of his commission of the bank robbery, he received 12 criminal history points for this early conduct. This alone would have placed him in Criminal History Category V. And though he committed additional offenses later in his life, these later offenses were not serious offenses. Indeed, neither the subsequent offenses themselves nor Mr. Cirasuolo's prior history of four burglaries were deemed serious enough by the Florida Court to warrant the imposition of any jail time at all. Yet, when combined with the points he received for the offenses he committed more than a decade later, the early burglaries caused his placement in Criminal History Category VI, the highest category on the criminal history scale.

Stated simply, Mr. Cirasuolo did not have the criminal background one would expect to find at this end of the scale. He wound up there because the six categories of criminal history in the Sentencing Table are keyed to the number and the length of a defendant's prior sentences, but not to the particular circumstances which (as in Mr. Cirasuolo's case) may reveal that the numerical formula leads to the placement in a category that overstates the seriousness of the past conduct.

Here, neither the length of the prior sentences nor the number of prior offenses when examined in light of the particular circumstances reflected the seriousness of criminal history of a typical Category VI offender. First, the length of time that Mr. Cirasuolo had previously served in prison for a total of 7 offenses was less than two years. While not insignificant, this is relatively small. And it was served long ago, between January 1987 and December, 1988, when defendant was a very young man being treated for mental illness.

17

The lack of seriousness of the prior offenses is also indicated by the particular sentences that were initially handed down. With respect to 6 of the 7 prior offenses, the initial sentence was some form of probation.

Third, the 4 burglaries that contributed so heavily to the CHC VI placement were right on the edge of not being counted at all. Under the Guidelines, not all prior offenses are counted. Among these are crimes committed when the defendant was a juvenile or outside the applicable time period of 15 years. See, U.S.S.G. §4A1.2(d),(e). The 4 early burglaries were committed more than 15 years prior to the instant offense; three of them were committed when the defendant was 18 years old, and the fourth when he was 20. The only reason they fell within the applicable 15-year period is that for two years prior, defendant had been hospitalized after having been found incompetent to stand trial.

Examination of the circumstances of the prior offenses thus indicates that CHC VI overrepresents their seriousness. As for the likelihood of recidivism and the need for an adequate deterrence, yet another factor suggests that a lesser sentence than that called for in the CHC VI guideline range might be expected to have the requisite deterrence. And that is the especially important relationship Mr. Cirasuolo has with his daughter. The daughter was 10 years old at the time Mr. Cirasuolo was sentenced. Incarceration for 110 months meant she would be an adult by the time he was released. If a lesson was to be learned by incarceration, that lesson could be learned in fewer than nine years, for he would surely be motivated to avoid reincarceration if released while she were still young.

The Court has already indicated its receptiveness to these arguments. Indeed, when the Court imposed the sentence at the lowest end of the guideline range in 2003, it explained that its concern with the deterrence aspect of the calculus. The Court specifically stated that the

18

sentence was set at the low end based on "the relationship [Mr. Cirasuolo had with his] daughter, *but also the fact that [he had] not spent any significant period of time in incarceration before now*." (S. 29; emphasis added)  This is the very kind of analysis encouraged by <u>Mishoe</u> when considering downward departures under section 4A1.3.

A more appropriate measure of the seriousness of Mr. Cirasuolo's criminal past would be obtained if the four burglaries committed in the early 1980's -- over 15 years prior to the commission of the instant bank robbery -- are removed from the equation.  Discounting the 4 early burglaries and moving downward 12 points to a CHC III (or lower) would lead to a reasonable outcome.[2]  This is confirmed by the fact that, when it proffered a plea agreement on the eve of trial, the Government maintained that criminal history category III was the appropriate category for sentencing.  (The proposed plea agreement was included in the appendix (at 17a) of Mr. Cirasuolo's brief on appeal to the Second Circuit which was attached as an exhibit to the § 2255 petition.)

The guideline range under CHC III for an offense at offense level 25 is 70-87 months. Given that Mr. Cirasuolo had been incarcerated only once before, and this was more than a decade and a half ago and for less than two years, and given that the pain inflicted by virtue of his removal from his daughter to whom he is unquestionably devoted would serve as an additional deterrent, a sentence in this 70-87 range could reasonably be expected to have the requisite deterrent effect.

Mr. Cirasuolo has already served 63 months.  With good time, this is an equivalent of a 72 month sentence.  If, with a 2 level downward departure on the horizontal axis, the Guideline

---

[2] The guideline range decreases dramatically as one moves horizontally across the table to lower criminal history categories: VI, 110-137 months; V, 100-125 months; IV, 84-105 months; III, 70-87 months; II, 63-78 months; I, 57-71 months.

range applicable guideline range were 70-87 months, imposition of a sentence of time served

would work out just right.

<u>Downward Departure Pursuant to §5K2.0</u>

A downward departure is also appropriate pursuant to U.S.S.G. §5K2.0 based on

confluence of factors including not only the over-stated criminal history calculus, but also

extraordinary family circumstances, diminished capacity, perceived lesser harm, and history of

physical, psychological and sexual abuse.

When Mr. Cirasuolo was before the Court for sentencing in 2003, the Court "reluctantly"

rejected his "confluence of factors" downward departure motion.  The Court said at that time:

> … I can't help but be affected by the obvious bond you have with your daughter, the fact that you have very successfully through what was obviously very difficult times for you, and the question seems, is really whether that is a ground that warrants a departure from the sentencing guidelines.  I have to conclude that it doesn't and I say that with reluctance because I very much respect what it is that you've done with your daughter.  I very much respect how difficult it must have been to raise a child dealing with all that you were dealing with, who apparently, by all accounts is well adjusted and happy and doing fine.

> And I think [counsel] is correct to say we have to look not only at the bond, the closeness of the bond between you and your daughter and the success you have in raising her but also what impact you incarceration is going to have.  I mean, incarceration by its nature results in very great heartache for those left behind and those going off when you're separated from you loved ones, and even acknowledging that, *your daughter seems to be in a situation in which she's going to be fine.  She's with relatives who clearly care for her and it's my belief that the good start you've gotten her off to will stand her in good stead.*

> So, although there are extraordinary cases in which family circumstances can result in a downward departure, I reluctantly conclude this is not one of them.

> The other bases that you sought downward departures on, I think are also ones that do not stand up to scrutiny.  The difficulties in your childhood, again, I recognize were very serious, were very debilitating you, but that is not, lack of youth guidance is not a basis from which I can depart under the case law, and I don't believe there is sufficient connection that's been made between your mental health and the commission of this crime.  I am, in reaching this conclusion, relying primarily on the study that was done by the Bureau of Prisons.

So again, that aspect of your health, your mental health is something that is obviously of significance and something that you need to deal with but I don't believe it's been sufficiently tied to this offense to warrant a departure.

(S. 27-9; emphasis added.)

Unfortunately, the Court's hopeful predictions about Jennie's situation did not come true. She has been shuttled from state to state, from one shelter to another, from one family to another. It has taken its toll on her and she now needs her father more than ever. This case is of a piece with those cases where an extraordinary family circumstance downward departure has been granted and upheld. See, *United States v. Faria*, 161 F.3d 761,763 (2d Cir. 1998) (reviewing cases and noting that, "In the past, we have upheld downward departures based on family circumstances `where the family was uniquely dependent on the defendant's ability to maintain existing financial and emotional commitments.'") (Citations omitted.) Mr. Cirasuolo was a single parent. The emotional consequences of his incarceration on Jennie are considerably greater than those faced by most criminal defendants who have a family, and, accordingly, a downward departure under the Guidelines is called for.

In addition, new information regarding Mr. Cirasuolo's battle with mental illness, and a careful scrutiny of information previously before the court relating to his criminal history show a sad interconnection between the two; his sickness clearly impaired his judgment and led him to crime. The findings set forth in the medical records presented in connection with the §2255 petition[3] thus refute the psychologist's conclusion in 2003 that "Mr. Cirasuolo's claim that

---

[3] See, in particular, the 1986 records from the Northside Counseling Center; the records of the psychiatrist Dr. Stephen J. Szabo and the Bay Area Psychiatric Consultants regarding auditory hallucinations in 1997; the records from Bridges, A Community Support System, Inc. reporting, inter alia, severe anxiety, confusion and hearing voices in December, 2000; Connecticut Department of Correction record of auditory hallucinations in April, 2001; MCC psychiatrist Dr. Hillel Glover's references to "history of delusions", "command hallucinations" and "acute

21

auditory command hallucinations led up to the instant offense is of questionable validity," his assertion that "these psychotic symptoms [persecutory beliefs, anxiety, and depression] appear questionable", and the prosecutor's argument at the first sentencing proceeding that Mr. Cirasuolo obstructed justice by fabricating and seeking to manipulate the test results.

Mental illness plus a childhood of abuse and neglect also undoubtedly combined to impair Mr. Cirasuolo's judgment when the State of Connecticut Department of Children and Families threatened to remove Jennie from his care. His belief that Jennie would be harmed if she were taken from his care was not irrational, and his fears overcame him. All of this in combination is a mitigating circumstance not adequately taken into consideration by the Sentencing Commission in formulating the guidelines, and calls for a downward departure pursuant to §5K2.0. See, United States v. Lauersen, 362 F.3d 160 (2d Cir. 2004) (cumulative effects departure); United States v. Brady, 417 F.3d 326 (2d Cir. 2005) (where severe emotional abuse caused commission of offense, downward departure may be warranted); U.S.S.G. §5K2.11 (Lesser Harms, Policy Statement); U.S.S.G. §5K2.13 (Diminished Capacity, Policy Statement).

### 18 U.S.C. § 3553(a)(6): The need to avoid unwarranted sentencing disparity

Data provided by the U. S. Sentencing Commission shows the kinds of sentences imposed in all federal cases. (The relevant U.S. Sentencing Commission tables are attached as an exhibit.) In Fiscal Year 2003 (when Mr. Cirasuolo was first sentenced to 110 months), the average or mean sentence for all offenders was 56.8 months; for robberies, it was 103 months, though the average was considerably lower for those in the lower criminal history categories.

---

auditory hallucinations" in November, and December, 2002; and the report from the Wyatt Detention Center in May, 2003 that Mr. Cirasuolo was hearing voices and seeing things; see also, Motion For Continuance and For Psychiatric Evaluation In Aid of Sentencing, July 30, 2002.

The mean for robbery offenders in CHC III, for example, was 77.6 months and the median, 63 months. Offenders whose guideline range was 110-137 months were in the top 13% of all offenders; in other words 87% of all offenders were in a lower sentencing range than Mr. Cirasuolo. In 2004 and 2005, all mean and median sentences were lower, and a sentence in the range of 110-137 months or higher represented an even smaller percentage of all sentences.

In short, the sentence we are seeking -- a sentence of time served (the equivalent of a 72-month sentence) -- would be higher than nearly three-quarters of all federal sentences, and an average sentence for robbery. It surely would meet the overarching criteria of being *sufficient but not greater than necessary* to comply with the four purposes of sentencing set forth in 18 U.S.C. § 3553(a)(2).

This was not the crime of the century. Without any departures, the Guidelines lead to an excessive sentence. By the Guidelines' measure, this would be considered a more serious offense than 87% of all federal crimes. Such overstatement breeds contempt not respect for the law. Mr. Cirasuolo has already paid dearly for his misconduct. To keep him away from his daughter any longer is not necessary and will, sadly and unjustifiably, punish his daughter more than him.

### The Florida Detainer

As noted above in connection with the criminal history points, when Mr. Cirasuolo committed the instant offense in 2001, he was still on probation for offenses (and violations of probation) committed in Florida in 1996, 1997 and 1999 (i.e., leaving the scene of an accident in 1996, purchasing cocaine in 1997, and theft of aluminum siding and driving with a suspended license in 1999). As a result, a detainer charging a Florida probation violation was filed against him by the Bureau of Prisons. A copy of the Notice of the Detainer Action, dated August 12,

2003, is attached. Also attached are copies of documents showing Mr. Cirasuolo's efforts at resolving the Florida matter. So far, those efforts have been unsuccessful.

In the event that the Court decides against Mr. Cirarsuolo and declines to reduce the previously imposed sentence to time served, Mr. Cirasuolo respectfully requests the court to designate a Florida State institution for concurrent service of any remaining portion of the federal sentence. See, Bureau of Prisons Program Statement re Designation of State Institution of Federal Sentence (also attached).

Conclusion

For the foregoing reasons, Mr. Cirasuolo asks the Court to impose a sentence of time served.


Dated: June 21, 2006


Respectfully submitted,

Jane Simkin Smith,
Attorney for John Cirasuolo
P.O. Box 1277
Millbrook, New York 12545
845-724-3415

CERTIFICATE OF SERVICE

Jane Simkin Smith, an attorney duly admitted to practice law in this Court and the courts of New York State, under penalty of perjury, hereby affirms:

On June 21, 2006, I served one true copy of the within Sentencing Memorandum, dated June 21, 2006, in USA v. Cirasuolo, 3:01 CR-85 (SRU) on the United States Attorney for the District of Connecticut, by mailing the same (via U.S. mail) to, AUSA Raymond Miller, U.S. Attorney's Office, District of Connecticut, 157 Church Street Floor 23, New Haven, Connecticut 06510.

I declare under penalty of perjury that the foregoing is true and correct.


Dated:   June 21, 2006
         Millbrook, New York

                          _____
                              Jane Simkin Smith